IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

UNITED STATES OF AMERICA,

          Plaintiff,

vs.                               Case No. 3:19-CR-131-jdp

SCOTT BLOOD,

          Defendant.

---

**SENTENCING MEMORANDUM**

---

On June 11, 2020, Scott Blood will be punished for his crimes. His advisory sentencing guideline, 292—360 months, is daunting. It would be higher, were its upper boundary not constrained by the combined statutory maximums for his offenses. While accurately calculated, it bears little relation to the appropriate sentence dictated by application of the factors set forth at 18 U.S.C. § 3553(a). His offenses are serious and demand a reciprocal response. But ten years is a serious punishment, and is sufficient to address the sentencing factors in this case.

    **I.**        **History and Characteristics.**

Measuring the character of a man convicted of a serious sex-offense is challenging. The specter of his offense has the potential to overshadow his other accomplishments. But, to quote Bryan Stevenson, "[e]ach of us is more than the worst thing we've ever done." And a careful examination of Scott's life shows this to be true in his case. He is no monster. He is a man who has struggled to deal with sexual dysfunction, but by most measures, has lived a productive and successful life.

As an initial matter, Scott has absolutely no criminal history. *Id.* ¶117. He aslso has a lengthy record of stable employment. After graduating from high school, he took a job with American TV & Appliance, where he spent the next 25 years working his way up from a stereo installer to network service technician. *See* PSR ¶145. He was with the company until it closed. *Id.* Thereafter, he briefly worked as a network engineer for CDW before taking a position with Boston FAM, where he worked until his arrest in this case. *Id.* ¶¶ at 142, 144. There, he was a network and in-store security consultant, setting up surveillance camera systems and installing and maintaining local area networks. *Id.* at ¶142. In addition to his regular employment, for the last decade Scott also worked part-time at Redline Watersports. *Id.* ¶143. While technically an employee, Scott held this job because it allowed him to spend more time involved with his favorite hobbies, boating and wakeboarding.

In addition to being a trusted employee, Scott is also a valued friend and family member. As described in the attached character letters, Scott was the type of person who was always willing to help others in need. He mentored to his two god-children, teaching them how to wakeboard and helping them in school. He was generous to his friends, helping them to purchase vehicles or repair their homes, and dutiful towards his family, travelling regularly to Iowa to care for his aging grandparents. He was the type of person to open-up his home and serve meals to National Guard members doing disaster relief, or volunteer to build a loft for a kindergarten classroom. Being a dedicated and loyal employee, good friend, and law-abiding citizen are real and positive things that Scott has done with his life. They do not negate his crimes, but neither should his crimes negate the positive contributions he has made to his friends, family members and community.

Of course, this does not tell the entire story. Scott clearly has struggled with a number of issues related to sexuality. He hid his sexual desire for men, and boys, from his fiancé. As evidenced by his online activity, he failed to appropriately regulate his behavior. In many instances this involved chat-exchanges with other adults in which he expressed a sexual interest in minors, but on several occasions, it also involved the receipt of naked images. As outlined below, he clearly struggled with these feelings. It was a struggle that he too often failed. But the fact that there was a struggle, rather than a wholesale adoption of deviant sexual attitudes, should matter. At the very least, it suggests a strong amenability to treatment.

## II. Circumstances of the Offense.

### A. Surreptitious recordings of EAK and BEE (Count 2s).

There is no excuses for Scott's actions. His job afforded him familiarity with, and access to, covert surveillance equipment. He used that knowledge to violate the trust and privacy of his fiancé's son and his girlfriend, capturing their most intimate moments. This unique type violation has undoubtedly caused real and palpable harm. The victims' statements make that crystal clear. But, acknowledging the harm that Scott caused, there are important factors present here which separate this case from the more traditional production of child pornography cases, and place it at the mitigated end of that spectrum.

First, unlike many cases involving the production of child pornography, Scott did not actually have sex with a minor. No adult had sex with any minor. The images he captured involved assenting sexual activity between two teenagers. They obviously did not want this filmed. And there is no dispute that this invasion of privacy was harmful,

but it is simply a different—and more mitigated—category of offense than cases where someone films himself, or someone else, actively sexually assaulting a child.

Second, none of the videos captured from EAK's room were ever distributed, in any fashion, to anyone else. This matters. A common and compelling argument justifying harsh punishment for child pornography offenses is that "[e]very instance of viewing images of child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse." Pub. L. 109–248, Title V, § 501, July 27, 2006, 120 Stat. 623; *see also Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250, 122 S. Ct. 1389 (2002) (noting "every publication of the image would cause new injury to the child's reputation and emotional well-being.") (internal citations and quotations omitted). In most child-pornography-related offenses the involved images are scattered across the Internet, prohibiting the proverbial cat from ever being placed back in the bag. This leaves the victims without any knowledge or control over who will consume images of their victimization, or when it will happen, but the lingering dread of knowing that it is certain to occur.

Unlike these situations, the boundaries of Scott's offense are clearly defined. The videos captured by the hidden camera were stored on his personal computer, and never distributed to anyone. *See* PSR ¶ 70. Upon the completion of this case, the videos will be destroyed. In fact, while he did view some of them, there is no evidence to suggest that he did so repeatedly. The fact that the images were not distributed saves the victims from having to "go through life knowing that the recording is circulating within the mass distribution system for child pornography." *New York v. Ferber*, 458 U.S. 747, 759 n.10, 102 S.Ct. 3348 (1982).

These two factors distinguish this from the majority of other cases involving the production of child pornography.  Surreptitiously recording a minor during intimate moments is illegal and unsettling, but it a different class of conduct than perpetrating a sexual assault against a child.  Similarly, creating such recordings without disseminating them in any fashion meaningfully and substantially limits the harm caused.  These factors mitigate Scott's actions in substantial ways, and separate this from the traditional production of child pornography cases that warrant the application of a fifteen-year mandatory minimum sentence.  The Government's agreement to amend the charges in this case, thereby removing the application of a fifteen-year mandatory minimum sentence, is an acknowledgment of this reality.

### B. Grinder and Kik chats with JPS and others (Count 1s).

In addition to the surreptitious recordings discussed above, Scott was involved in a number of illicit chat-exchanges using various chat applications.  The PSR detailed these exchanges, including one with minor JPS that formed the basis for Count 1s, in detail.  And while the information contained in the PSR is accurate, it is potentially misleading.  Set forth one paragraph after another, the PSR creates a highlight reel, so-to-speak, of Scott's misbehaviors.  This laundry list of misdeeds creates the impression that engaging in illicit conversations and/or receiving child pornography through chat applications was one of his primary activities.  That simply was not the case.   In reality, these types of interactions—those involving or about minors—comprised a very small percentage of his overall activity.  And, a nuanced evaluation of these illicit exchanges shows that, even when he was engaging  in inappropriate activity, he often appeared to struggle with his actions.

A forensic examination of Scott's phone identified 8,888 separate chat threads, occurring over a variety of chat-based applications such as Grinder, Kik and Telegram. *See* PSR at ¶35. However, law enforcement only identified twenty chat-exchanges that involved either the discussion of sexual activity with a minor or the receipt of child pornography. *See Id.* at ¶¶ 45-63.[1] That is less .002 of the overall chat-exchanges located on his phone. Even accounting for the fact that the forensic examination, which relied on keyword searches, likely missed some inappropriate exchanges, the overall percentage of his online activity that was illegal was exceedingly low.

And, even in instances where he was engaged in illicit online behavior, his actions indicate a struggle—albeit a struggle he would too-often lose—in controlling his inappropriate impulses. Unlike many cases where individuals solicit minors to send naked images over the Internet, the occasions when Scott did receive naked images from individuals purporting to be minors did not involve him seeking out, targeting, or even encouraging the minors to do so. Instead, in nearly every instance it was the opposite. In these exchanges, Scott declined, usually on multiple occasions, offers by a purported minor to send naked photographs, before ultimately agreeing to accept the photographs.[2] To be clear, that he was a reluctant recipient of child pornography during these exchanges does not magically alleviate him of culpability for his actions. There was no reason for him to be involved in these conversations in the first place. The point is to dispel any

---

[1] The PSR identifies 18 Kik and Grinder chats, in addition to the thread with Charmy202, that contain inappropriate content involving minors. There were also three links to cloud-storage folders that contained child pornography. *See* PSR ¶ 64-66. Counsel believes these were sent through Telegram by the same user, at approximately the same time, representing one additional thread.

[2] For example in his exchange with Kik user "Anime_Watcher12345", an individual who purported to be 15 years-old, he declined four offers before finally agreeing to receive a naked picture. *See* PSR at ¶46. In his exchange with Kik user "Memesofficial", a self-identified 14 year-old, Scott declined nine times before finally agreeing to receive a naked picture. *See id.* at ¶49. The same behavior was evident in his chat-exchange with Kik user "niggwardthehotpolic", age unknown, where Scott denied wanting any naked pictures, before ultimately agreeing to accept a partially clothed image. *See id.* at ¶51.

notion that he was an unabashed predator looking for minors to groom and exploit. The texts of these chat-exchanges simply do not support that conclusion. This was someone dipping his toes into a forbidden pond, rather than diving-in.

His struggle in managing his online behavior was similarly evident in his exchanges with JPS. This was by-far his most involved chat-exchange with a minor, and the only such exchange that extended beyond the isolated receipt of a naked images. These conversations, many of which are appropriately described as raunchy, often involved discussions of meeting in person. The majority of the time it was JPS who raised—and frankly advocated for—these meetings. But, despite many opportunities to do so, Scott never escalated the situation by following through on the discussions and actually meeting JPS to engage in the sexual activity. To be clear, not sexually assaulting a teenager despite the opportunity to do so is hardly an accomplishment. The point is not to unburden Scott of responsibility for his actions, argue that JPS—a minor—bears some responsibility for their interaction, or to suggest that his conversations with JPS were somehow okay because the two never met. Rather, it is to highlight another example of Scott recognizing that what he was doing was wrong, and at least attempt to set boundaries on his behavior. Obviously, the boundary was not where it needed to be. But the fact that he set one at all is further evidence of a struggle. The Court has undoubtedly seen many cases where this type of online activity escalates to in-person contact. That Scott showed some—albeit insufficient—restraint does not exonerate him, but it matters when assessing the magnitude of his crime.

Scott's behavior was criminal. But it bears repeating, his Internet communications with, or about, minors, comprised a very small portion of his overall

7

online communications. Over 99% involved neither child pornography nor the subject of exploiting children. In the instances in which he did engage in these inappropriate or illegal chat-exchanges, his behavior—evidenced by at least some attempts to dissuade minors from sending nudes, his unwillingness to escalate an inappropriate online relationship to an in-person relationship, and the dearth of overall child-pornography in his possession—indicate that he was making attempts to minimize or control the behaviors which he knew to be inappropriate. He is solely responsible for his actions. But in his failures it is evident that he struggled with what he was doing. That struggle is a mitigating factor that the Court ought to consider.

### III.  A decade in prison is a sufficient but not greater than necessary period of punishment.

The Court must balance both utilitarian (promoting respect for the law, deterrence, protection of the public) and retributive (reflecting the seriousness of the offense, providing just punishment) considerations when imposing sentence. Of course, the Court must first consider the advisory guideline, but it is free to disregard the guideline should it fail to adequately capture the appropriate balance of the factors set forth at § 3553(a). In this case, the guideline grossly overstates the appropriate sentence. The majority of sentencing factors, other than those grounded in retribution, do not call for a lengthy sentence. But, ensuring that the severity of the crime is reflected in the sentence and imposing a just punishment do call out for a meaningful, and lengthy, period of confinement. In balancing these factors, with respect paid to similar sentences imposed in similar types of cases, ten years is sufficient to satisfy the various sentencing considerations in this case.

A. **The advisory guideline does not reflect an appropriate sentence.**

As an initial matter, the advisory guideline, 292 to 360 months, grossly overstates what an appropriate sentence would be in this case. Scott's guideline is so high primarily because of the application of a five-level enhancement under USSG §4B1.5, entitled Repeat and Dangerous Sex Offender Against Minors. This guideline applies because the hidden camera Scott placed in EAK's room produced multiple files of child pornography, occurring on different occasions, thus establishing a pattern of prohibited sexual conduct. *See* §4B1.5, n. 4(A) & 4(B). While technically applicable, it overstates Scott's culpability.

Scott has no prior criminal conviction, sexual or otherwise. As previously documented, he engaged in other inappropriate online behavior prior to his production of child pornography, but none of that amounted to "prohibited sexual conduct" as that phrase is used under this guideline. *See* §4B1.5, n. 4(A)(ii) (excluding the possession or receipt of child pornography). This 5-level enhancement, for being a "repeat offender," applies because of a single action, Scott's placement of a motion-activated surveillance camera in EAK's bedroom. That this enhancement would apply with the same force to much more aggravated conduct, such as multiple prior sexual assaults of a child, or prior sex-trafficking of a child, highlights the arbitrary nature of this guideline.

The resulting sentence called for by the guideline is similarity problematic. Such a significant enhancement results in a recommended sentence that is greater than what would likely be imposed for many sexual assaults, and some homicides. The bottom end of the guideline, 24 years and 3 months, is equal to the *maximum* term of confinement, 25

years, available in Wisconsin for committing a second degree sexual assault of a child,[3] incest with a child,[4] sexual exploitation of a child,[5] or homicide by the delivery of a controlled substance.[6]  It is greater than the *maximum* available term of incarceration, 15 years, for committing a second degree reckless homicide[7] or homicide by intoxicated use of a motor vehicle,[8] and greater than the *maximum* term of incarceration, 5 years, for the sexual assault of an adult.[9]  Absent the application of this enhancement, Scott's guideline would have been 168—210 months.  *See* PSR at ¶¶ 110-114.  While still greater than necessary, this is a more accurate reflection of the actual offense conduct, and closer to the appropriate sentence called for upon the application of the § 3553(a) sentencing factors.

### B.  The sentencing factors set for in § 3553(a) call for a sentence of 10 years.

Perhaps the most important factor a court must consider when imposing a sentence is the protection of the public.  The Court has an obligation to ensure that someone who poses an immediate danger to an individual, or the public writ large, is incapacitated.  Simply put, this is not a consideration warranting a substantial period of incarceration in this case.  Scott has no criminal record, no history of violent behavior, and no history of committing hands-on offenses with any minors.  His transgressions were completely facilitated by the use of a computer.  Supervised release conditions will

---

[3] *See* Wis. Stat. § 948.02(2) (defining second degree sexual assault of a child as sexual contact or intercourse with a minor between the ages of 13 and 15, as a class C felony); *see also* Wis. Stat. § 973.01(2)(b)3 (stating that a class C felony is punishable by up to 25 years of initial confinement).
[4] *See* Wis. Stat. § 948.06.
[5] *See* Wis. Stat. § 948.05
[6] *See* Wis. Stat. § 940.02(2).
[7] *See* Wis. Stat. § 940.06 (defining second degree reckless homicide as a class D felony); *see also* Wis. Stat. § 973.01(2)(b)4 (stating that a class D felony is punishable by up to 15 years of initial confinement).
[8] *See* Wis. Stat. § 940.09
[9] *See* Wis. Stat. § 940.225(3)(a) (defining non-consensual intercourse, absent the presence of certain aggravating factors such as the use of force, as a class G felony); *see also* Wis. Stat. § 973.01(2)(b)7 (stating that a class G felony is punishable by up to 5 years of initial confinement).

be particularly effective at reducing his risk of re-offending in the community. They will eliminate his access to both the tools and privacy needed to re-offend. Any Internet access he might have can be easily tracked and monitored. With this oversite, as well as the sex offender treatment he will be required to participate in while on supervision, there are sufficient tools available in the community to ensure his future compliance with the law.

Ten years is also sufficient to provide both specific and general deterrence. For someone such as Scott, who had never spent so much as a night in jail prior to his arrest, a ten-year sentence is a massive punishment. It will ensure his incarceration until his late fifties. At that point, without controlling for his lack of criminal history, his statistical rate of reconviction will be 12.2 percent, and his rate of reincarceration will be 9 percent.[10] As for general deterrence, there is little evidence to suggest that the length of the Court's sentence will actually matter.[11] But even assuming that there is some general deterrent created by the Court's sentence, ten-years is sufficient to accomplish this goal. While probation, or a short period of prison, might embolden a potential child-pornographer to take action, one is hard-pressed to consider a potential offender deciding that a ten-year term of incarceration is insufficient to dissuade him or her from criminal action, but that some greater period of incarceration would be. Stated otherwise, if someone is actually considering the length of punishment they will face if caught, ten years is a sufficiently harsh punishment to deter them from acting. If they are not

---

[10] *See* United States Sentencing Commission, The Effects of Aging on Recidivism Among Federal Offenders, p.23, Fig.15, (2017), *available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.*
[11] *See* Daniel S. Nagin*,* "Deterrence in the 21st Century," 42.1 *Crime & Justice* 199, 201 (August 2013) ("First, there is little evidence that increases in the length of already long prison sentence yield general deterrent effects that are sufficiently large to justify their social and economic costs.").

deterred, it is likely because they are not considering the consequences, rather than deciding that ten years in prison is "worth" committing a child-pornography-related offense.

While the utilitarian based sentencing factors do not demand a lengthy prison sentence, the sentencing factors grounded in retribution do. Scott's conduct, while mitigating in certain respects, was reprehensible. The pain he caused to the victims is unmistakable. There is no argument that his offense is anything other than serious, and a just punishment must reflect that severity. The real question before the Court is, does ten years suffice? Is ten years in prison a serious enough punishment to reflect the gravity of Scott's offense? Is it just? Unfortunately, there is no mathematical equation that can answer these questions. But reference to other sentencing data—a sentencing factor unto itself— suggests that the answer to these questions is: "yes."

The Wisconsin statute prohibiting the production of child pornography can be found at Wisconsin Statutes § 948.05(1). Since 2003, when the current version of Wisconsin's "truth-in-sentencing" structure was implemented, 70% of those sentenced in Wisconsin state court for producing child pornography receive a sentence of less than ten years incarceration.[12] In Dane County, where this offense occurred, 83 percent of sentences imposed for the production of child pornography are under ten years.[13] Thus, had this case remained in state court, where it was originally charged, it is highly probable that Scott would have received a sentence of ten years or less.

---

[12] *See* Courttracker analysis, attached as Ex. 1. In total, 155 out of a total 221 cases, resulted in a sentence of less than 10 years of incarceration. Notably, this figure is for sentences of *less* than ten years, excluding those cases where a sentence of exactly ten years was imposed. Limitations in Courttracker's software prohibit counsel from modifying the ranges in which the sentencing data is sorted. Presumably, the percentage of those receiving sentences of ten years or less would be even higher than 70%.

[13] *See* Courttracker analysis, attached as Ex. 2. In total, 15 out of a total 18 cases resulted in a sentence of less than 10 years of incarceration.

There are also recent Western District of Wisconsin cases that offer similar support for the imposition of a ten year sentence. In *United States v. Kurrelmeyer*, 3:19-cr-62, the Defendant was originally charged with production of child pornography, but pled to distributing child pornography, and was sentenced to twelve years based on a joint recommendation of the parties. *See* Plea Agreement, Dkt. 20. This case involved conduct more aggravated that is present here, as the defendant filmed himself engaging in sexual explicit conduct with a minor under the age of twelve on two occasions and then distributed the images to a group of 50 individuals.[14] Similarly, in *United States v. Charles Raimondi,* 3:16-cr-88, the defendant was charged with the production of child pornography, but ultimately pled to possession of child pornography, and upon a joint recommendation was sentenced to ten years in prison. *See* Plea Agreement, Dkt. 23. This case again involved not only the production of child pornography, but also its distribution.[15] Finally, in *United States v. Hosler*, 3:18-cr-133, the defendant was sentenced to ten years after being convicted at a court trial for violations of child enticement, interstate travel to engage in illicit sexual conduct, and possession of child pornography. There, Hosler travelled from Texas to Wisconsin for the purpose of having sex (and apparently filming himself doing so) with a twelve-year-old, in what turned out to be a law enforcement sting operation. *See* Findings of Fact and Conclusions of Law, Dkt. 37. Each of these cases is distinguishable in some fashion from this case. But, acknowledging that every case is different, they still provide relevant datapoints that

---

[14] *See* Wisconsin Man Indicted on Child pornography charges, Kevin Murphy, Forum News Service, Dec. 13, 2019 (available at https://www.duluthnewstribune.com/news/crime-and-courts/4822871-Wisconsin-man-indicted-on-child-pornography-charges).

[15] *See* Department of Justice press release, Park Falls Man Sentenced to 10 Years for Possessing Child Pornography, May 31, 2017 (available at https://www.justice.gov/usao-wdwi/pr/park-falls-man-sentenced-10-years-possessing-child-pornography).

should serve as guideposts for the court's judgement here.  If sentences of ten to twelve years were "just" and sufficient to reflect the seriousness of the offenses in those cases, a ten year sentence is similarly sufficient in this case as well.

This was a disturbing crime.  Most sex offenses, particularly those involving minors, are.  But unlike most of those offense, Scott did not actually perpetrate a physical sexual assault, nor magnify the damage he caused by distributing any of the images to others.  He caused serious harm to his victims, and for that he deserves a serious punishment.  Ten years in prison, particularly for a man who is nearly fifty and who has never previously seen the inside of a jail cell, fits that bill.  It will protect the public, promote respect for the law, and create parity with other similar offenses resolved in both state and federal court.  It is sufficient to satisfy the §3553(a) factors, and it is the right sentence in this case.

## IV.   CONCLUSION

For the reasons stated herein, the Defendant, Scott Blood, respectfully requests that the Court sentence him to ten years in prison, on each of Counts 1s and 2s, to be served concurrently.

Dated at Madison, Wisconsin, June 9, 2020

Respectfully submitted,

Scott Blood, Defendant
Nathan T. Otis
Nicholson, Gansner & Otis, S.C.

BY: _____/s/_____
NATHAN T. OTIS